Battue,, J.
The writ of certiorari in this case -brings before the Court for review the judgment of his Honor, the Chief Justice, pronounced in vacation in a proceeding on a writ of habeas corpus. The facts, upon which the judgment was. rendered, are set forth in the petition of the applicant for the writ and the return of the officer, and they present the question whether the Act of the Confedérate Congress, approved the 5th day of January, 1864, and entitled “An act to put an end to the exemption from military service of those who have heretofore furnished substitutes,” is constitutional. The act is in these words :
“ Whereas, in the present circumstances of the country, it requires the aid of all who are able to bear arms-: “ The Congress of the Confederate States of America do enact, That no person shall be exempted from military service by reason of his having furnished a substitute ; but this act shall not be so construed as to affect persons who, though not liable, to render military service, nevertheless furnished substitutes.” „
The Chief Justice, in the opinion which he has filed as explanatory of the reasons upon, which his judgment was founded, has declared that the petitioner, having, under *401 the provisions of the Act of April 16th, 1862, furnished a substitute and obtained his- discharge from military service, made a binding contract with the government, which Congress had no constitutional power to violate. The question thus presented upon the constitutionality of the Act of January, 11864, is invested with momentous importance, qnd has been argued before us with very great zeal and ..¡ability by the counsel on both sides. I have given to the arguments all the consideration in my power, and will proceed to state the conclusion at which I have arrived and the reasons which have conducted me to it. .
The governments which the emigrants from ' Great Britain established on this continent in the 16th and lfth centuries were largely embued, with the principles of the country from which they sprang. And even when, in the 18th century, they severed the bands which had conneeted them with the mother country, and' became free and independent States,-the new governments which they formed, though differing widely from the old, still retained, particularly in their Legislative bodies, many of the attributes and much of the spirit of the nation from which they emanated. The source'from which Legislative power was supposed to be derived in the nationalities of the Western continent was very different from what it was in the Eastern, but the extent of power, except in the cases of a restriction by a written constitution, varied very little in the Legislatures of the free States of America from that of the Parliament of Great Britain. It may aid us, then, in our investigations, to inquire what were the powers’of the-British Parliament, and what those of the several American States prior to the formation of the government of the United States, and subsequently of that of the Confederate States.
The power and jurisdiction of Parliament (says Mr. Jus-tóos Blackstoae, quoting from Sir' Edward Coke,) are so *402 transcendent and absolute, that it cannot be confined, either for causes or persons, within any bounds. It hath sovereign and uncontrollable authority in making, confirming, enlarging, restraining, abrogating, repealing;, reviving and expounding of laws, concerning matters of all possible denominations, ecclesiastical or temporal, civil, -military, maritime or criminal. * ■ * * . It can, in short, do everything that is not naturally impossible, áhd,'therefore, some have not scrupled to call its power, by a figure rather too bold, the “ omnipotence of Parliament.” In the exercise of these vast powers,.we know that the Parliament claimed and acted upon the privilege of violating contracts, and of taking away vested rights, when it was deemed that the good of the country required it. An interesting instance of the latter kind is seen in the statute of 9 and 10 Vio., ch. 54, which opened the Court of Common Pleas to the practice of the bar generally. Prior to the year 1834, the Sergeants at Law had had from time immemorial the exclusive privilege of practising, pleading and audience in that, Court, but in that year his Majesty, King William 4th, issued a warrant under his sigu manual to the Judges of the Court, commanding them to open it to all the other, members of the Bar.' The Judges did so, and the Sergeants, after acquiescing in the change for a few years, brought the matter to the'attentiou oí'the Court, and questioned the authority of the CroXvn. to take from them a valúable exclusive privilege, which, from the very origin of the Court, had been vested in them. After a solemn argument, the Court decided against the power of the Crown tq do what the warrant had commanded, but admitted that it might be done by Parliament, (see 3*7 Eng.,C. L. Rep., 338 and 362 ;) and it being a reform which ’the best, inter- ■ ests of the country demanded, it was accomplished, by the statute to which we have referred. £t is but justice to the *403 legislators of Great Britain to say, that though they possess, this transcendent power, and have sometimes abused it, they have, in the main, been very solicitous tp secure intact private rights, and to preserve inviolate the public faith.
We come now to the Legislatures of the American States, after they had gained their independence. When estab-tablished by the’ people of their respective States, these bodies were invested at once with supreme Legislative power, except in the particulars in which the people themselves, assembled in Convention, had restricted them by written Constitutions. See Hoke vs. Henderson, 4 Dev., Report 1. Among the powers which they claimed and exercised, was that of resuming granted lands, and of otherwise interfering with the obligations of executed and executory contracts. This is proved both by the political and judicial records of the country. The case of Owings vs. Speed, 5 Wheat., Rep. 520, (4 Curtis, 628,) isa striking case directly in point. The facts are not stated by the Reporter, but from the opinion of the Supreme Court, as delivered by Chief Justice Marshall, the case will be seen as follows ': The suit was brought in the Circuit Court of the United States for the District of Kentucky, to recover a lot of land lying in Bardstown. The plaintiff claimed under a patent issued by the Commonwealth # Virginia in 1780, A part of the same land was afterwards, in 1788, granted by the Legislature of Virginia to other persons, and the defendant claimed under them. A verdict and judgment were rendered for the latter, upon the ground that when the act in question was passed, the Constitution of the United States had not been adopted, therefore, the prohibition upon the State to pass laws violative of contracts contained in that Constitution did not apply. Here there was a case where a parcel of land vested in one person by a patent, which *404 was an executed, contract, was taken from him and granted to another by the Legislature of the same State that liad issued the patent, and yet it was sustained by the highesst Court in the United States, affirming a judgment, not of one of the State Courts, but of a District Court of. the United States. That was one mode in which the obligation of a contract was violated. Another very common one was seen in the passage of laws by which “ worthless lands and other property of no value to the creditor were made a tender in payment of debts ; and the time of payment stipulated in the contract was extended.” See Sturgis vs. Crowninshield, 4 Wheat., Rep. 122, (5 Curtis, 371.) These instances, show conclusively that the Legislatures of the different States, prior tó the adoption of the Federal Constitution, claimed the power to violaté - contracts whenever, in their estimation, the good of the State .required, and the Courts felt constrained to sanction their acts'by adjudications in favor of them. '
Let us now see what powers were vested in the Congress of the United States. The Federal government was established by the people of the several States “ in order to form a more perfect Union, establish justice, insure domestic tr'anquility, provide for the common defence, promote the general welfare, and secura1 the blessings of liberty to themselves and their posterity.® 'To. accomplish these all important objects, each State surrendered a portion of its sovereignty, and vested it in the new government. The attributes of sovereignty thus given up were those which concerned the foreign relations of the government. Thus, we -find among the enumerated powers of the Federal Constitution the great ones to lay and collect taxes, to borroAv money, to regulate commerce, to declare and conduct a war, and to raise and “support armies' and navies. These powers were' essentially and absolutely necessary to enable *405 the United States to take and maintain its stand among the nations of the world. By looking at the Constitution, it will be seen that the powers are given with very few express restrictions, and with none implied except what are necessary to the continued existence of the State governments. Where-it is said that thp Federal government is one of limited powers, it is not to be understood as true in the sense that all its powers, as for instance the great powers of war and peace, of taxation and the regulation of commerce, are limited, • but that the number of powers granted is limited. The proper expression, then, is that it is a government of enumerated powers, rather than that of one of limited powers. The truth Of this as to the power of regulating- commerce is admirably demonstrated in the able and interesting exposition of the nature and extent thereof contained in the opinions of the Judges in the great ease of Gibbons v. Ogden, 9 Wheat. Rep. 1, (6 Curtis 1 ;) and as to the power of taxation, in the opinion of Chief Justice Marshall in the leading case of McCulloch vs. State of Maryland, 4 Wheat. Rep., 316, (4 Curtis, 415.) But it is the war power of the Federal government which my argument requires me more particularly to consider. It is contained in the Constitution of the United States, Art.', 1, see. 10, pars. Mh 11, 12, 13, 14, 15 and 17. This power is given in the most unlimited terms, "the only restriction upon it being that, in raising and supporting armies, “ no appropriation of. money to that use shall be for a longer term than two years.” (See paragraph II of the a?tide anj section referred, to above.) The first duty of a nation is that of self-preservation, and to that end “ it has a right to every thing necessary for its preservation.” Vattela Law of Nations, book 1, ch. 2, see. 16 and 18. Tbe framers of the Federal Constitution, being men no less distinguished for a profound knowledge of the principles of *406 'government than for patriotism, knew this and acted accordingly. They were master-workmen, and in the edifice of government which thoy erected, they took especial care that those for whose use it was intended should have ample means to protect it. lienee we find in the 23d No. of the Federalist, Mr. Hamilton declaring that c- the authorities essential to the care of the common defence are these: to raise armies, to build and equip fleets, to prescribe rules for the government oi both, to direct their operations, to provide lor their support. These powers ought to exist without limitation, because it is impossible to foresee or define the extent and variety of national exigencies, and the correspondent extent and variety of tire means which may be necessary to satisfy them. The circumstances that endanger the safety of nations are infinite; and for this reason no constitutional shackles can wisely be imposed on the power to which the care of it is committed. * * * * This is one of those truth which, to a correct and unprejudiced -mind, carries its own evidence along Avith it,_and may ho obscured, hut cannot be made plainer by argument or reasoning. It rests upon axioms as simple as they are uni-vorsal — the mean* ought to tie proportioned to the end; the persons, from whose ag.mcy the attainment of any end is expected, ought to posse. s the 'meoits by which it is to be attained.” To the samo eilcct speakes Mr, Madison in the 41st number of ike same work : CiXs thepoAver of declaring war necessary No man will answer this question in the negative. H'would he superfluous, therefore, to enter into a proof of the affirmative. * * * * * * * Is the power of raising armies and equipping fleets necessary? This is involved in the foregoing power. It is involved in the power of self-defence. But was it necessary to give an indefinite rowER of raising TROOPS, as avoII as providing fleotV,' and of maintaining both in peace as well as in war? *407 The answer to these questions has been too far anticipated in another place to admit an extensive discussion of them in this place. The answer, indeed, seems to be so obvious and conclusive, as scarcely to justify such a discussion in anyplace. With'wl,.,; color of propriety could the force necessaryd'or defence bo limited by those who cannot limit the force of offence ?. If a Federal Constitution could restrain the ambition, or set bounds to the exertions of all other nations, then indeed might it prudently restrain the discretion of its .own governim-ni, and sot bounds to the exertions for its own safety.”
The views of these eminent statesmen and patriots, as to ■the unlimited extent of the war power conferred by the Eederal. Constitution upon the government of the United States, have never been called in question. An inspection of the Constitution of the Confederate States will show that the'same unlimited war power lias been conferred, and in almost the same terms, upon the Confederate government.. Thus, in Art. 1, sec. 8, it iff declared that “ the Congress shall have power (par. 11) to declare war, grant letters of inar;que and reprisal, and make rules concerning captures on laud and-water, (par.. 12) to raise and support armies', but no appropriation of money to that nap shall be for a longer term than two years, (par. 13) to provide and maintain a na.vy, (par. 14) to make rules for the gowrinpent and regulation'of the land and naval forces, (par. 15) to provide-for calling forth the militia to execute the laws of the Confederate States, suppress insurrections and repel invasions, (par. 16) to provide for organizing, arming and disciplining the militia, and for governing such part of I them as may be employed in the service of the Confederate 1 {States, reserving to the States respectively ‘ the appoint--, jment of the officers, and the authority of training the mili-reia according to the discipline prescribed by Congress, (par. *408 18) and to make all laws which shall be necessary and proper for carrying into execution the foregoing powers, and all other powers vested by this Constitution in the government of the Confederate States, or in any department or officer thereof.”
A government, thus invested with the unlimited sovereign power of declaring war, and raising and supporting armies, and possessing also the scarcely less restricted sovereign powers of taxation, of borrowing money; and of regulating commerce, (see Constitution of the Confederate States, Art. 1, sec. 8, par 1, l and 3,) must have attached to it the right, of eminent domain ; for this right is an essen - tial and inalienable attribute of sovereignty. It is so essential and so inalienable that the several States retained it as connected with their respective remaining sovereignties, notwithstanding the. great powers which they surrendered to the general government, and notwithstanding they had ■also surrendered the power of passing any “law impairing the obligation of contracts.” See Raleigh and Gaston R. R. Co. vs. Davis, 2 Dev. and Bat., Rep. 451; State vs. Glen, 7 Jones' Rep. 321. This right of eminent domain is the.right which belongs to the society, or to the sovereign, of disposing, in ease of necessity, and for the public safety, of all the wealth contained in the State. ' It is evident that this right is, in certain cases, necessary io him who govern,s, and consequently is apart of the empire or sovereign power, and ought to be placed in the number of the prerogatives of majesty. When, therefore, the people confer the empire on any one, they at the same time invest him with the eminent' domain, unless it he expressly reserved.” See Vattell's Law of Nations, Book 1, Ch. 20, sec. 244. The Con derate government must also possess, as an inseparable incident of its sovereign power to declare war and io raise -armie»; the right to command the cervices of all its *409 citizens capable of bearing arms. Cí Every citizen (says. Vattell, boob 3, ch. 2, sec. 8,) is bound to serve and defend the State as far as he is capable. Society cannot otherwise be maintained; and this concurrence for the common de-fence is one of the principal objects of every political association. Every man capable of carrying arms should take them up at the first order of him trim lias (he power of ma-' kink war.'” Other writers on government, id great eminence, have laid down the same doctrine. 3ue t.he.aufchorities referred to in the case of Ex.parte. Tate, decided by the Supreme Court of Alabama at its last January Term.
As the Confederate government possessed the undoubted right of eminent dovmvn, those who framed its Constitution deemed it proper u >t to restrict the exercise of it, for that, would . have been highly impolitic, hut to regulate ii by declaring that private property shall not he taken for public use without just compensation. (See Constitution, Art. 1, sec. 9, par. lf>.) ¿hit there is no restriction nor regulation whatever in the Constitution on the power of the govv eminent to command the services of all its ams-bearitig population, unless It be deemed such that, for (he raising and supporting of armies, there shall be no no appropriation of money for a longer term than two years. (See .Mr. Madison's article on this subjo ¡ in the 41st number of the Federalist.)
If 1 have succeeded in showing, as 1 think 1 have, that the Confederate government possesses the right of eminent domain, and has also the power of commanding the services in its army of all its eitize capable oi'bearing arms, .1 am prepared to .-rove that Congress had the constitutional power, by the act of the 5th of January, 18(54, to call into the military service of the country' the petitioner, Walton, notwithstanding he had previously furnished a substitute. The only obstacle in the way of my argument is the assump *410 tion, made by 'those who oppose it, that Walton,,by procuring and putting into the army a substitute, as he. was authorized to do by the Act of April 16th, 1862, made a contract with the government, which the legislative department of that government has no power to violate. Admitting, under a protestation, that a contract was made between Walton and the government, and further, that the effect .of the Act of April 16th, 1862, was not merely to grant an exemption as a matter of grace and favor, yet I insist that the government had’ the power, whenever the necessities of the country should require, to annul and disregard it. Let us see what is the nature of the right or interest which Walton acquired by virtue of his supposed contract.. Was it property/or something in the nature of property, or a mere personal privilege. ' If it were none of these, I am at a loss to imagine what it was. The counsel for the petitioner say that it was property, a thing of value. Suppose it. was, then the government had an undoubted right to take it upon making just*compcnsation to the owner, as has alrea’dy been dearly dciyonstiated. Hut it can not he regarded as property in the sense in which that term is used in the Constitution. It can not he taken ” from the owrfer. ,Tt can not bo liable to the payment of his debts ; and yet it. is a well oeiabliahed.prineiple oflaw that a man can not own property, in the proper sense' of that term, of .any kind, real or personal, in possession, in expectancy or in action, legal or equitable, which can not, in some way, or in some Court, be made available by his creditors for the satisfaction of their demands. Craves vs. Dolphin, 1 Simee, Rep., 66; Piercy vs. Roberts, 1 Myine and Keen, Rep., 4; Snowden vs. Doles, 7 Sim. Rep. 524; Mebane vs. Mebane, 4 Ired. Eq. Rep., 131; Hough vs. Cross, 4 Jones, Eq. Rep., 295. It seems tome to be certain then that Walton's exemption from military service *411 was not “ property ” which could bé taken from him for public use, and, not being such, there was no obligation on the government to make compensation. As Walton’s exemption from military service was not property in the sense oí the Constitution, it must be regarded as a mere personal privilege, and as such it may be a thing of value. Still it was liable to the control of the government by virtue of its right of eminent domain, or its power to command the services of all the arms-bearing population of the country. It can not possibly escape the operation of one or the other of these two great prerogatives of government. Had it fallen under the first, then a just compensation would have been due to the owner ; but being under the second, the Constitution makes no such provision in his favor. It resembles, in the respect of being personal and inalienable, the right which a person may have in an office, and it is clearly established that when the necessities or the'good of the country require it, the office may be abolished, though tho effect of it will be that the officer will be deprived of tho emoluments .without any claim to compensation on that account. Hoke vs. Henderson, 4 Dev., 1; Butler vs. Pennsylvania, 10 How. Rep., 416. The necessities of a nation, as of an individual, have laws of their own, and that is the true meaning of the celebrated maxim, that “ necessity has no law.” It has a law, but it is the law of exception. Thou shalt not kill,” is an injunction of the law, divine and human. Thou mayest kill in necessary defence' of thine ■ own life, is a precept of the same law, of no less force than the other.
I have considered this case without adverting to the fact that Walton does not allege in his' petition that he paid any money or other valuable consideration to his substitute to induce him to become such. If he were entitled to ‘any compensation, then, it would be difficult to ascertain the *412 quantum. But the- view which I have taken of the case, renders it unnecessary for me to 'say any more on the subject. I have alluded to it only for the purpose of showing that I -had not overlooked the allegations of the petition.
Having, as I hope, vindicated successfully the 'power of Congress to revoke whatever right or privilege Walton had acquired by his supposed contract with the government made under the sanction of April 16th, 1862, I will endeavor to show what was the true nature of the contract, if contract it were. Parties who enter-into a contract, necessarily do so with reference to the existing law. If they use terms apparently absolute, but to which the law annexes a condition, such condition will of course be implied. The distinction mentioned in the books between express and implicit conditions, and express and Implied contracts, is founded upon this principle. So if one of the parties to the contract possesses the power (which under certain circumstances it will be its duty ío exeren-m) to annul, the other party must necessarily be supposed, to eater into the’ contract with the understanding that it m iy, under such circumstances, he annulled. The party having the power to annul must be taken to have reserved it, whether it be expressed in tire terms of the contract or not, and the other party must bo taken to have tacitly acquiesced in such reservation. Government is the only party which can have the right to annul a contract to which it is a party ; and when the exigency arises which [requires] the avoidanee-when it may bo that the very salvation of the nation depends upon such avoidance- — the' government would be faithless to the great .trust confided to it if it did not proceed fearlessly to the fulfillment of its duty. He who contracts witl) the government, then, cannot complain that the' government avails itself of its power to put an end to the contract in virtue of the condition impliedly annexed to it.
*413 These considerations have led me to the conclusion that Congress had the constitutional power to pass the act o^the 5th of January, 1864, and that, in doing so, it did not violate its faith with the principals of .substitutes by calling them again into the military service of' the country. In coming to this conclusion, I have not availed myself of the authority of adjudication made by the highest tribunals iu several of our sister States ; yet I think I might rightfully have done so. The law of Congress was intended to operate in each and ail of the Confederate States. It Would be unequal and therefore unjust that ft should take effect iu some of the States,and not in others. The State Courts have, upon writs of habeas corpus, taken concurrent jurisdiction with those of the Confederate States, to decide upon the constitutionality of the acts of Congress, called the conscription acts, and with rospect to them there ought to be as much uniformity of decision as is practicable. • Impressed witb this consideration, and knowing that the constitutionality of the act of the 5th of January, -1864, had been heretofore sustained by the» Supreme Court of Appeals of Virginia, in the ease of Burroughs vs. Peyton, by the Supreme Court of Georgia in the ease of Fitzgerald* and others, and by the Supreme Court of Alabama in the casi? ex parte Tate, I should have been reluctant to have concurred in Making a different decision. The judgment of his Honor, the Chief Justice, rendered in- vocation, was given before either of the adjudications, to which I have referred, was made known, and. of course he could not have been influenced by ihat weight of authority, which would now, were my convictions different from what they are, press upon me.
As my brother Manly concurs in the conclusion at which I have arrived in this case, the judgment, given by the Chief Justice in vacation, must be reversed with costs, and *414 the petitioner, Edward S. Walton, be surrendered to the custody of the defendant, T. H. G-atlin.
Manly, J.
The great importance of the subject, and the disquietude which it has caused in the public mind, in luce me to add to the reasons of my brother Battle, such as oc-cqr to me for the judgment we give. I shall do so briefly.
All contracts or engagements on tire part of government, with individual citizens, must, from the paramount nature of its duties to the public, be subject to conditions. Public necessities may arise which will require a modification or revisal of the policy out of which such contracts spring, and it will become the duty of the sovereign power to provide for-such necessities by all means and at every hazard. Wherefore, if it be conceded that ^substitution, under the Act of the 16th of April, 3862, was a contract in the sense contended for, dispensing the conscript from further military service during the war,,it was, nevertheless, a contract, subject to the condition of which I speak. From the nature of the case the government, under its high responsibilities, must judge when this necessity comes ; and Cou-gress has accordingly declared in the preamble to the Act of tlfe 5th of January, 1864, in obedience to which the petitioner was conscribod a second time, that it bad come. “Whereas,’’ it says, “under the present circumstances of the country, it requires the aid of all who are able to bear arms.”
If any evidence were proper or needful to confirm the truth of the view taken by Congress, a survey of the situation at that time would convince any unprejudiced mind. A large portion of our States was occupied by a foreign foe. The invasion was established by a power stronger in all military appointments than ours, having an overwhelming population more numerous in the proportion of five to one, *415 and large armies were mustered and marched'into, the, country by every open avenue to pillage and waste the land and to subjugate its inhabitants. Surely the time bad come, if such a time can come, when the government had a right to call upon every ma.n to aid in its defence.
Authorities are abundant. as to the rights and duties of the war power’in such an emergency. Vattel, Burlamaqui,, "Wheaton and Calhoun have been referred to and are believed to be full and explicit upon the point that exigencies’ may, and will most probably, arise in the history of every community, in which its entire resources in men and money may be needed to defend its existence ; and that, in such case, it is’ the right and duty of the war power to call them into action. Every other consideration yields to self-preservation — the supreme law. Vattel, booh 3, ch. 2 ; Burlamaqui Nat. and Pol. Law, vol. 2, p, 151; Wheat. International Law, p. §5 Calhoun’s Discourse on Government, p. 10.
Whatever restraints may be imposed in the Constitution; upon the government of the Confederate States in other respects, it is clear, in respect to the making of war, maintaining armies and providing for the public defence, that they are unfettered. -Of these matters that government has sole charge, and it constitutes one of those high attributes of powjcr, upon the proper exercise of which its very existence depends. It can not he abdicated, contracted away or encumbered, hut should he kept as a trust to be used for the public safety when there is need for it, unembarrassed by claims of private right. The power of the government over persons, like that which it possesses over property in the right of eminent domain, is to employ every man, as well as every dollar if need be, in defence. The government is but the representative of the people, and it is, *416 therefore, in substance, the right which the people have to call upon one another fbr aid.
These* principles are reasonable, consist with natural law, and with the law T>f the land, and should be present in the minds of all citizens making contracts among themselves or with the government. They are binding upon all, and need never therefore be carried into express stipulation, for this could add nothing to their force. Every contract is made in subordination to them, and must yield to their control as conditions inherent and paramount, whenever a necessity for their execution shall occur.
When Congress therefore calls upon a citizen who, under ordinary circumstances’-would'be exempt, for military service in this emergency, to speak of it as a violation of con-trae'', seems to me to be a misuse of word a it is a. condition of the contract not arising out,of its literal terms, but superinduced by tbe pre-existing .and higher authority of the' laws of nature, of nations, and of the community to which the parties-belong.
The principle here asserted, has been rarely discussed, or suppos-d io have'any bearing upon the practical aifairs of mankind, because the occasions have been raro in the history of the world, which called for its practical application.
• ¡Subject to this intrinsic condition which attaches itself to every contract, Í think they are binding alike between individuals, and between government mid individuals. Government can.not be constrained by legal process to execute its contracts with individuals, but their ■fulfillment is nevertheless enjoined by tbe immutable laws' of right and natural justice, which-even governments arc not at liberty to disobey. ' ,
There is no article in tbe Constitution of tbe Confederate States which forbids the Congress to pass an Act impairing the obligation of contracts, and the Courts could not, 1 take *417 it, declare such an Act inoperative.' There is nothing in the organic law to prevent them from violating theij- own contracts, but faith and honor, a sense of justice and of their own interests, which they can not be supposed to want, and which constitutes for them their rule of action.
1 have considered the case thus far, upon the hypothesis that a contract was intended, between the government and the conscript. I will now proceed to enquire whether that hypothesis he true.
It should he remembered that the petitioner was eonscribed under the Act of April, 1862, put in a substitute, as allowed to do by the 9th section of that Act, and was discharged. He was again conscrihed under the Act, of January-, 1864,, sued out the writ of habeas corpus y now under review, and was discharged by the judicial officer before whom he was taken.- • '
The act under which the second enrollment was made, is the well known act of the 5th of January, 1864, the preamble of which has been already quoted. No point has been made upon the constitutionality of conscription -generally, but resistance is made to the act of ’64, upon the ground that the furnishing a substitute under the Act of 1862, and his consequent discharge was n contract of discharge for the war.
The clause of the Act allowing substitutes, is in the following words : ” persons hot liable To duty may be received as substitutes for'those who are, under such regulations as the Secretory of War may prescribe," (8th section Act of April, 1862.) This is the charter of powers under which the enrolling officer acted in receiving substitutes ; and the question is, did it authorize, in any sense, a contract on-behalf of the government ?
No regulation of the Secretary of War, or special language in th.e certificate of discharge, is believed to effect the *418 question! None has been called to our attention. Indeed, with respect-to both, I suppose the true enquiry would 'be, what was authorized by the law ? Hid it authorize an irrevocable exemption ? The entire power of the officer, I take it, would be to declare the conscript exempt under the clause of the Act in question, according to its true intent and meaning. To this test, the acts of all ministerial officers should be brought. Within the pale of the law they are valid and binding : without, they have no efficacy;
There have been many definitions of a contract. The one which seems.to be fullest and most approved, and which has been elsewhere adopted in discussing this subject, is u an agreement ’upon sufficient consideration to do, or not to do, a particular thing, between parties able to contract willing to, contract, and actually contracting. " The distinction noticed hy Judge Campbell, in his opinion in the case of the State Bank of Ohio vs. Knoop, si muid be kept in mind, between statutes which create hopes, expectations faculties and conditions, and those which form contracts. The ilfch section of the Act of 1802 authorized the condition of exemption upon certain terms (the putting in of a substitute) and may have raised expectations that thin condition would be allowed to continue through the term of service for which the enrollment was made. But it by no means follows that there was an engagement of the Government to this effect. Jt may he conceded that it was the wish and purpose of the conscript to make a eontuact, that it was indeed his understanding and intention; hut' this is not conclusivo ; mutuality of intention or assent is of the essence' of a contract. Light may he thrown upon the question whether there was a contracting on the part of the government by turning to the condition of affairs at the time this act of 1862 was passed, and hy a consideration of the object it was intended to occomplish.. The States were *419 at that time pressed by a'foe with superior forces and munitions of war, threatening by overwhelming numbers to surround and crush them as ■ it were in the folds of a serpent. To meet this state of things the law was enacted. The Confederate government must have been greatly in need of soldiers, and had in prospect an absolute want of the whole available physical force at their command fop de-fence. Is it probable the States would at such a time have intended by contract to strip themselves of any part of their powets, and thus diminish their ability to make successful their defence.
' Let it he remembered that the government bad the absolute power to enrol the citizens for military duty, limited only by the exclusion of State officers, that it had actually resorted to the compulsory enrollment of a class .of which the petitioner was one. A service was thus demanded of him which he owed, and from which he had no escape as a matter of right. Why áhould the government make any contract with him dispensing him irrevocably from duty, and weakening and fettering its military power ? For, it is .easy to demonstrate the principles of substitution,' viewed as an irrevocable contract, must diminish the force of the. nation, cannot augment it.
' When 'tlie legislative department seeks to enlist individual citizens in an enterprise promising public good, and enacts a law granting franchises and privileges to those ■who will associate' and contribute the necessary capital, and citizens actually embark in' the • enterprise, it is properly regarded ás a contract executed. In such cases it is manifestly the interest of the legislative body to hind the State to the extent indicated in the Act, in order to secure favor from those who owe them.nothing of the sort, time, labor, money andBkill. It is not so in the case of the conscript. The *420 Legislature lias unlimited authority. to, use his personal service. It has but to command, and he must obey.
If in a law exacting such service, there be embodied a privilege of exemption, which can not, by any possibility,, promote, and must probably retard the end proposed, the reason for construing statutes into contracts, utterly fails. In the one instance the government descends from its high position, and says to the citizens, here is an object to be accomplished which will benefit the whole people, but which it is proper should be effected by private enterprise : if you will undertake it, I will grant you privileges which will render the doing of it more profitable and easy. In the other, from its eminence of power, it says to them, the country is invaded, the national existence is menaced, you all owe military service — I hid you to the field. The one is the language of contract “ du ut facias,’' the'Other, that of command, sic volo, sicjvheo. No degree of clemency with which the Legislature may choose to temper the exercise of prerogative, can transmute either command into eon tract, or its accompanying privilege, into vested right. There might he a contract between the principle and Ids substitute, hut with that the government had nothing to do, except to acquiesce in the same, and accept'the one man it stead of the other. The transaction between them xna.v posset-* the elements of a contract, but not so as between' tfie government and the principal. Where is the consideration, for-mstauev, upon which it is based ? The'government p-ts nothing; one man is hut substituted for another. There is no damage or inconvenience wronght to the prime}!;!. Upon his motion he puts in a substitute, which he pref-ns, to doing personal service. No outlay of money is made at government request. The conscript is accommodated. The government gets no advantage, subjects no one to Inconvenience.- There is, therefore, not the semblance of'» cor- *421 sideration moving between the Confederate States and the conscript. Indeed it'requires more ingenuity than I possess to perceive-any one of the elements which constitute a contract in these substitute transactions. Other exemptions from military duty are allowed by the' same acts of Congress, conceded to be revocable, which appear to me on principle no less binding than that of substitution ; for instance, the exemptions of persons engaged in manufactures and in the mechanic arts. These cases are quite as strong as those of exempts by substitution. In the former ’case the parties submit to sacrifices from which the government as well as citizens derive advantage ; but in the latter there is no advantage accruing to government. I confess myself iuchpable of appreciating the logic, which makes one of these exemptions revocable at will,' ^et throws around the other all the sanctity of inviolable compact.
Indeed, I discern in neither an intention, on the part of Congress, to bind the public irrevocably -; but in both the announcement of a policy, which might last for a longer or shorter period, but determinable at the will of the Legislature,.
Looking at this 9th section of the Act ,of 1862 it will be found there, is no specified term of substitution or exemption, no declaration of legal consequences to ensue, nothing which savours of abdication or suspension of the power confessedly possessed by Congress over the Conscript, and which It- was the express object, of the ¿-etto exert. The language of the clatise is permissive and not mandatory, as in the other clauses, and the inference is that exemption by grace only was intended, to continue at the will of the Legislature. This will might? reasonably be expeeiel to prolong the exemption whilst, and only whilst, in the opinion of the Legislature, it should be compatible with the safety of the country. Parties might fairlv hope that, wither? a *422 change in the necessities of the States, they would not be again called upon to do military duty; but the Congress represents in this exercise of power a sovereign, and as such conscripted a portion of its citizens for military duty, upon the then existing considerations of policy, without annexing! restraints on its will or abdicating its prerogative ; and, consequently, was free to modify, alter or repeal the requisition at. will.'
No engagement of an explicit or direct nature, on the ;part of the government, is pretended. The engagement •contended,for is at best deduced from substitution by way of inference. This is against established laws of interpretation. Government is held to part with its powers only by express grant, never by implication. Charles River Bridge vs. Warren Bridge, 11 Peters, 548; Parsons on Contracts, 511; McRee vs. Wilmington R. R. Co., 2 Jones, 109.
The direct authority referred to in the argument, Commonwealth vs. Bird, 12 Mass., 442, was a case of military exemption. In a statute requiring certain extra military duties it was stipulated that those who performed them for the space of live years should be exempt from further military service for life. Bird had confessedly put himself in a condition to claim'this exemption, and was in fact exempt for some years ; but the exeinjrtion was afterwards revoked by statute, and the revocation was held to be legal.
We have been asri-ded. in our consideration of the subject before us, by eases of a like nature in the States of Virginia, Georgia, and Alabama, which seem to have been well considered. These eases decide the Acts of April and September, 1862, and also the Act of January, 1864, to be constitutional and valid.
They arc entitled, I think, to much weight, and serve to confirm and strengthen the conclusion to which this Court *423 bascóme. Burrows and Abrams Sup.. Court of Virginia. Fitzgerald, Daley, and Coben, in Georgia and Tate, in Alabama at Summer Sessions, 1864,
Reviewing then, and condensing what has been said, I am of opinion 1st, that Congress, in the exercise of the war power, can not grant permanent and-irrevocable exemptions upon any terms whatever, and viewing such exemptions in the light of. contracts, they must be subject to the condition, that if the public necessity require', they may be revoked, and that each successive-'Congress must judge of the necessity. •
2d. That the act of Congress of January, 1864,' declared such a necessity thqn to exist, and therefore, the revocation by that act of exemptions by substitution was valid and legal.
'3rd. That the 9th section of the Act of April, 1862, did not authorize exemptions as matters of contract on the part of the government, but as matters of grace and favor ; and that the policy off that act in this particular, was subject to modification or repeal at all times at the will of the legislative body
4. In conformity with.these principles, I am of opinion that the Act of Congress of January 5th, 18G4, declaring that “ no person shall be exempt from military service by reason of bis having furnished a substitute,” and the act of February 17th, 1864,■ which repeals all previous exemptions,'both have the effect of repealing so much of the Act of April 16th, 1862, as allows an exemption to any one furnishing a substitute, and are constitutional and valid. And the petitioner in this case, notwithstanding he had furnished; a substitute, is now liable to military service, agreeably to the provisions of said Acts of January 5th, and February 17th, 1864. •
The decision below, discliargiag the prisonei, is reversed, and he is recommitted to the casto ly of Captain Gatlin.