Theodore Parker, plaintiff in error, vs. Charles Kaughman, defendant. Lieut. Clark, plaintiff in error, vs. Robert Brady, defendant.

[1.] The quantum of power necessary to, and actually vested in the Confederate Government, for purposes of war, considered; and also the securities provided against its abuse

[2.] The 8th section of the act of the 17th February 1864, entitled "An act to organize forces to serve during the war," is constitutional.

[3.] The report of a board of army surgeons, declaring a person between the ages of eighteen and forty-five years, unable to perform active service in the field, but capable of performing some of the duties enumerated in the aforesaid section, must specify the particular kind or kinds of the enumerated duties of which he is capable, (as whether of a clerk, or guard, or laborer, etc., etc.,) and the assignment to duty must conform to that specification; otherwise the assignment will be illegal and void.

Decisions on *Habeas Corpus*. By Judge Lochrane. At Chambers. December 1864, and January 1865.

These two cases were consolidated in the Supreme Court.

On the 22d of December 1864, Charles Kaughman presented to Judge Lochrane a petition for the writ of *habeas corpus*, which alleges, "That he (the petioner) has been regularly examined by a board of army surgeons, and pronounced unfit for field duty, and only fit for light duty; that Dr. Theodore Parker, surgeon in charge of the Blind School hospital at Macon, restrains him of his liberty, and compels him to perform the onerous and exhausting duties of baking; which detention, as petitioner is advised, is contrary to law."

The writ was granted; and to it, Dr. Parker made return, "That Kaughman was legally enrolled and assigned to duty in the Stout hospital, then located in the city of Macon, in the month of July or August of the present year; that he was afterwards transfered to the Blind School hospital, of which respondent has charge, and, thus, that the enrollment and assignment were made in accordance with an act of Congress, entitled, 'An act to organize forces to serve during the war,' approved February 17th, 1864; that he, Kaughman, is performing duties connected with the hospital department, by baking bread, a business in which he was engaged a number of years previous to the commencement of the war, and for which he is well qualified."

At the hearing it was shown to the Court, "That the petitioner had been regularly enrolled during the month of March or April 1864, and pronounced by the board of conscript surgeons making the examination, as unfit for duty in the field, but fit for light duty; that he was thereupon assigned to the hospital department, and required by the surgeon of the hospital to bake bread."

Judge Lochrane held that the petitioner was not liable to service as a baker of bread, the same not being military service; and adjudged that he be discharged, on the ground, that "The Government has no right to assign him to bake bread, under the law and facts of this case." To this judgment Dr. Parker excepted.

On the 16th of January 1865, Robert C. Brady presented to the same Judge his petition for *habeas corpus*, alleging "That he is held in custody and restrained of his liberty by Lieut. Clarke, under the pretence that he is liable to military service in the Confederate States army, which restraint and custody are illegal, in this: that he is not liable to such service, having been pronounced by a board of surgeons as unfit for field duty, and having been assigned to light duty; that he is now in the conscript camp, and by reason of his physical disability, is not required to perform any duty."

The writ was granted. What return was made to it, the record does not disclose. The bill of exceptions states that the case was heard at Chambers by Judge Lochrane, on the 20th of January, when counsel for petitioner "Read the petition and the answer of respondent, and showed to the Court that petitioner had been regularly enrolled some time in the year 1863 or 1864, and pronounced by the board of conscript surgeons making the examination, as unfit for duty as a soldier in the field, but fit for other light duty; and that he was thereupon assigned to duty in accordance with the provisions of the act of Congress, approved 17th February 1864, relating to such cases." The Court passed a judgment of discharge; and this judgment, as contained in the record, recites that it appeared to the Court the petitioner had been examined by a board of surgeons of the Confederate States, and found unfit for field service, and "assigned to light duty." The Judge's opinion, however, as written out at length and copied in the record, embodies a somewhat different statement of the facts; and this statement, on the argument of the case in the Supreme Court, was agreed upon by counsel for both parties, as correct, and as the one to be adheared to in adjudicating the questions of law involved in the case. The statement referred to is as follows: "Brady, after being discharged from liability to military service, on account of physical disability, by some two or three medical boards, was finally found fit for light duty. He has been in camp four months without doing or being assigned to any duty. He is upon crutches; and for the reasons stated, alleges he has been illegally deprived of his liberty."

In deciding this case, Judge Lochrane held that the 8th section of the act of February 17th, 1864, was unconstitutional.

C. J. HARRIS, H. COBB, E. A. NISBET, and S. HALL, for plaintiffs in error.

POE, JOYCE, L. STEPHENS, COLE, DeGRAFFENREID, and RUTHERFORD, for defendants.

*By the Court.*—JENKINS, J. delivering the opinion.

Two questions have been made in these cases, consolidated for argument. 1st. The constitutionality of the 8th section of the act of the Congress of the Confederate States, approved 17th February 1864, entitled "An act to organize forces to serve during the war;" the effect of which section is to enroll, for limited and easy service, men previously exempted for disability. 2d. The legality of the proceedings for the enrollment of the relators, under that section, if it be held constitutional. Upon the first question, the arguments, on each side, have been numerous, elaborate, and able. Much criticism has been expended upon the character of the Confederate Government: some holding, that within the range of its delegated powers, it is absolutely sovereign; and others, that it is wholly devoid of the attribute of sovereignty, (which abides only in the people of the several States,) but that it may, nevertheless, exercise the clearly delegated powers as freely and as amply as if it were sovereign. It is manifest, that, as affecting this case, there is no practical difference between the disputants. The simple question for our consideration, is, has the Constitution conferred upon Congress the power exercised in the enactment of the section referred to? If so, it must be found in the clause authorizing the raising of armies, which has been so freely discussed, so variously construed, and so productive of apprehension, real, or apparent, in the public mind, during this war. In the argument of this case, counsel have inveighed vehemently against the power assumed, as oppressive to individuals, and incompatible with republican institutions. These views may not be passed over in silence, because from them is sought to be deduced, as a basis of interpretation, the spirit and intent of the constitution; and because, moreover, they tend to excite the imagination, and warp the judgment, thereby disturbing patient and logical investigation of the subject.

[1.] That the administrators of a limited government

encounter many strong temptations to encroachment; that the war power, in all its bearings, is liable to abuse; and that extraordinary vigilance in guarding against both, is not only commendable, but necessary, we freely admit. But, on the other hand, we cannot shut out the proofs, that the public mind of this country is deeply imbued with excessive morbid jealousy, which is ever trenching upon legitimate power, and seeking security against its abuse, by imposing unreasonably rigid restrictions upon its use. Carefully threading our way through the mazes of litigation between citizens and agents of the Governments, both State and Confederate, of which the existing war has been prolific, and bearing in mind the ancient conservative maxim, "*In medias res, tutissimus ibis,*" our purpose is to avoid extreme opinions; giving to rightful authority full scope, and bridling usurpation, even where it promises public utility. We have frequently had occasion to consider the nature and extent of the war power confided by our constitution to the Confederate Congress—the dangers to popular liberty and to the reserved rights of the States resulting from it, and the securities provided for them. In the consolidated cases of *Barber vs. Irwin, Jones vs. Mercer, etc.*, decided at the late Milledgeville term, we reasoned thus: "Taking into view, at the same time, the complicated nature of international affairs, unavoidably imperiling the peace of nations, the vast armies employed in modern warfare, and the tendency to encroachment of political power in free governments, we see clearly that a proper adjustment of the latter is a problem by no means easy of solution. But it is apparent that this is an appropriate subject for consideration in the formation of such Governments. Ours is of very recent origin, and its framers not without the benefit of experience. It is our happiness to believe, that in theory, at least, they have solved the problem; and if practical efficiency be not yet fully attained, it must be sought in amendment of the fundamental law. It may be safely affirmed, that there are powers (and prominent among them is that of war) which cannot be made sufficiently ample for probable

contingencies, and yet so guarded, *in the grant itself*, as to avoid possible abuses. As we understand it, the philosophy of our system is, to make the grant large enough to meet such contingencies, and to provide against abuse in the structure of the Government. Let us illustrate : we may suppose that the sages who framed our constitution, felt their utter incompetency to estimate the extent of preparation which it would be necessary for the Confederate Government, fifty years hence, to make, in peace, for war, or the numerical force that would be required in war, or the amount of revenue necessary to prosecute it. Hence, the breadth of power conferred in regard to the raising of armies and of revenue. But did they overlook the danger of its abuse? Did they leave it without checks and safe-guards? By no means. Where are these to be found? We answer, in the structure of the Government. 1. The tenure of all offices is comparatively short—of some employed in the exercise of these powers, absolutely so. 2. They are entrusted not to one man, but to many. 3. These compose not one body, but two, acting separately, yet required to concur in the passage of laws. 4. To constitute one of these bodies, each of those States, whose sovereignty, and even existence, are supposed to be endangered, appoints, through its Legislature, two of its own citizens, to serve for a limited term. 5. The other body is more numerous, consisting of representatives from each State, partaking of State pride and home influences, in common with their fellow citizens, among whom they reside, by whom they are chosen, and to whom they are bi-ennially held responsible. 6. Over the acts of these bodies, the Chief Magistrate, elected by the whole people, (not as constituting one mass, but as organized into State sovereignties,) exercises a veto power, which does not absolutely annul them, but compels their reconsideration in the reflected light of his wisdom, and their abandonment, or re-enactment by two-thirds of each body. 7. In a third department, the Judiciary, is reposed the power of arresting the execution of unconstitutional laws, a salutary restraint;

but one which should be applied with great circumspection.

The security thus afforded is both preventive and remedial of abuses. The responsibility of the representative to his constituents, and his community of interest with them, predispose him to act with caution and fidelity, and the always recurring election is a potent corrective of his errors, whether of judgment or of purpose. Nothing is more absolutely certain than that the vast operations of Government cannot be conducted without more or less of trust—of confidence."

But we are told, that the war power, in the extent to which it is exercised by the Congress, better befits absolute despotism; and we are asked, can such things be tolerated in a free Republican Government? We shall endeavor to show that there is great exaggeration in this view of Congressional action; but in the present connection, we desire to expose the false estimate of the quantum of power necessary to the maintenance of free governments in this age of the world. All distinction between the administration of domestic and of foreign affairs—between the just relation of the citizen to the Government, in the execution of the one and the other of these great public trusts, seems to have been lost sight of. In domestic national economy, the amount of service necessarily exacted of the citizen, is very inconsiderable, and beyond this, and the restraint of acts prejudicial to the body politic, all servitude exacted, all coercion practiced, all interference with his voluntary pursuits, is oppressive—is tyranny. But it must not be forgotten, that Governments, however free in theory and in practice, have their parts to act in the grand drama of international affairs. They must hold intercourse, and maintain relations, with all other governments, whether free or despotic. They may have controversies—*wars*, with the most absolute and potent. When this issue comes, there is no necromancy in Republicanism to spirit away the invader—no magic spell, to resolve into friendliness his hostile purpose. It is an issue of force, and the Republic must put forth man for man,

gun for gun—must match strength with strength. It is concession enough to Liberty, that with us, even in such crises, the power is wielded by no usurping or hereditary despot, according to his caprice, but by chosen Representatives of the people, in accordance with the principles and usages of free Governments. Still, it must be *real power*, power over the citizen, which he may not resist; else, over-sensitive republicans, aspiring to independence of their own government, may be enslaved by another. We cannot suppose, that either the framers of our Constitution, or the people who adopted it, preferred to leave the liberties and the sovereignty of the country at the mercy of foreign potentates, rather than invest the public councils with the power of defending them; that they dreaded foreign conquest, less than domestic rule. Let us realize, at once, that war is an abnormal condition of society; and that where it obtains, whatever be the form of the Government, the status of the citizen or the subject, is more or less modified to meet its demands. The citizen is transmuted into the soldier, and the soldier is, *ex necessitate rei*, subjected to arbitrary rule, such as the citizen knew not before. The freeman's consolation is, that every sacrifice, whether of personal ease or freedom of action, of property, of health, or of life, is an offering on the altar of liberty.

We are aware that there are, in these suggestions, no new ideas, but only old familiar truths, all the more valuable for that. Our purpose is simply to place them in the scale against the imputed usurpations and oppressions of our Government, and to hold the balance up to view, that all may see where the preponderance is—whether on the side of tyranny, or on that of conservative authority.

[2.] These preliminary remarks, though somewhat extended, as were the arguments they are intended to meet, may facilitate the solution of the constitutional question directly involved. The first section of the act to "organize forces to serve during the war," provides that from and after its passage, all white men, residents of the Confederate States, between the ages of seventeen and fifty, shall be in

the military service of the Confederate States, for the war. No question has been made as to the constitutionality of this section, and it should be observed that it is this which exacts service of the relators. The eighth section, upon which the question is made, and which only prescribes a modified service for persons conditioned as they are, is as follows: "Hereafter, the duties of provost and hospital guards and clerks; of clerks, guards, agents, employees, or laborers, in the commissary's and quartermaster's departments; in the ordnance department; and clerks and employees of navy agents; and also in the execution of the enrollment acts; and all similar duties, shall be performed by persons who are within the ages of eighteen and forty-five years, and who, by a board of army surgeons, shall be reported unable to perform active service in the field, but capable of performing some of the above-named duties, *specifying which*," &c. This section, it is argued, is unconstitutional, for that, it is not covered by the clause conferring power "to raise armies," nor by any other clause. The men therein described, it is insisted, are found incapable of service in the army—are not put into the army—but are seized and put to other servitude.

The act certainly contemplates that they are put into the army, because the first section applies to them the same language as it does to able-bodied men. It declares of them all, that they "*shall be in the military service.*" But we are told that, as to them, this is a *misnomer*—that they are, in point of fact, without the pale of the army. At the threshold of the argument, arises the question—what is an army? And here we have had curious definitions, astute disquisitions, and references to lexicographers, to prove that men described in this section do not appertain to the Confederate army. Some hold that an army is "an assemblage of men, armed and organized to do battle;" others that it is "a body of armed men in the field, for warlike purposes;" and still others, in more homely but equally intelligible phrase, affirming, that "an army is composed exclusively of fighting

men." Although these definitions and others, more carefully framed by lexicographers, may be true to a general intent, they are not so to a particular intent; although descriptive of a majority of persons composing an army, they do not meet the cases of many who unquestionably belong, and are indispensable, to modern armies. Let us exemplify by our own. The President of the Confederate States is in the army, because he is its commander-in-chief; yet he seldom goes to the field—need never go; he is not armed, or need not be. The Adjutant and Inspector General, the Commissary General, the Quartermaster General, the Surgeon General, abide continually at the capital, never use arms, and are yet indispensable to a well organized army. And so of post commissaries and quartermasters, who collect and distribute supplies. But of those who go to the field, there are very many who, not only are not required, but are not permitted, ordinarily, to do battle, because the services they render are so important, that care is taken to shield their persons, as far as practicable, from the casualties of war; such are engineers, pioneers, pontoniers, field-surgeons, commissaries, and quartermasters. We have instanced a few, but it is notoriously true, that in all well appointed armies, there are many, both commissioned officers and privates, who are not designed for field service, or who, being in the field, are non-combatants. It is not denied that, in emergencies, they may be armed and put into the fight, but with them the *rule* is otherwise.

In this connection, we remark, that we do not derive the authority here claimed for the Congress, as some do, from the power "to support armies." We find it in that, "to *raise* armies." We understand an army to be a body of men organized for military service; and whatever appertains directly to military operations, is military service. There are certain departments of an army, to the efficiency of which, clerks, guards, laborers, &c., are indispensable; so much so, that it has been found prejudicial to the service to depend, for them, upon the caprice of employees by con-

tract. Hence the practice of detailing soldiers to such duties. These are held to service for a definite term, or for the war; they are subject to military law, bound to obey their superiors, and, therefore, most efficient. This depends upon the same principle as the incorporation into the army of large classes of men, usually non-combatants, heretofore enumerated. They all might possibly be obtained by contract, but that resource is too precarious for the exacting demands of war. Our brother in the Court below holds, that the word *army* "means a body of men armed for war, and, in modern times, implies infantry, artillery and cavalry." He therefore rejects, as surplusage, the commissary, quartermaster, and surgical departments—the engineer corps, pontoniers, and pioneers.

In what does this restrictive sense of an army, sought to be imposed upon our Congress, originate—whence is it derived? We are told here, as we were upon the alleged unconstitutionality of compulsory enrollment, that the Congress must refer to] precedents—must raise and constitute armies in conformity with the usages of civilized nations of this day. Our learned brother, whose judgment is under review, resorts to this test. We extract from his opinion, a very interesting epitome of the military systems of divers nations, as follows:

"In Russia, not only are invalids exempt, but nobility, clergy, magistrates, students, and merchants of particular guilds. In Prussia, the conscription takes every citizen able to bear arms, to serve, at twenty years old, for three years, then two years in the Reserve, after which he joins the Landwehr, in which he remains, subject to call in time of war, until his thirty-second year, and in the second Bau, until his thirty-ninth year, when he goes into the Landetrum. In France, all citizens between twenty and twenty-six, are liable to conscription, besides Reserves; and when Napoleon, whose memory still floats over the world like an inspiration, was grappling the military power of the world, he only took the able-bodied men for armies from France. In Belgium,

the Burgher Guards, as distinguished from Troops of the Line, is composed of able-bodied men. In England, conscription is unknown. The military power of Austria consists of a standing army, and army of Reserves. The exemptions are numerous, and no provision made for other than able-bodied men, except, as in England, those who have been disabled in active service. In Turkey, the army is organized on European principles; there are six orders or divisions, embracing or divided into Active, or Nazamie, and Redif, or Reserve. The Urban and rural police are made up of musselmen volunteers, like the English constabulary.

"In Switzerland, there is no standing army, but every Canton contributes a fixed contingent when called on—the ages between twenty-four and thirty-four forming the term of active service, and between thirty-four and forty-four, the reserve. In Spain, the army consists of regulars and reserves. In Germany, all the States act federatively, and the contingent of men and money each State must give in time of war, is fixed according to population. In Denmark, the army is recruited by conscription—the period of conscription commencing at twenty. Four years in the line and four in the reserve; after this, they remain in the Festmannen, assimilating the Prussian Landwehr, subject to call up to their forty-fifth year. In Sweden, the army proper is raised by enlistment, and by conscription. In Norway, Japan and Netherland, there are standing armies."

We have made this extract, not only because it contains curious and useful information, but because a careful perusal of it shows how utterly unavailable to the argument these precedents are. They establish nothing authoritatively, because no two of his systems agree. He considers the reference valuable in this case, because there is not found in it " such an idea as classification on account of disease or physical inability." But if these precedents are to control in the construction of our armies, we shall next be told that in them there is not to be found " such an idea," as putting into the army persons under twenty, or over forty-

five years of age. They would, with equal conclusiveness, establish,. that according to military usage among civilized nations, all males not within those years, are either old men or boys—are not of the material out of which armies may be constructed, and are, therefore, not within the constitutional grant of power.

In the review of the systems thus presented, we find support for the conclusion, (sufficiently obvious of itself,) that there is no invariable rule for the construction of armies; that it is, and necessarily must be, to a great extent arbitrary, because dependent upon the particular circumstances of the country for whose protection they are required. In those European nations whence these precedents are drawn, the populations are dense, and in some of them, excessive. The material is most abundant, and both policy and humanity dictate the selection only of the best. With us, the territory to be defended is large, the population sparse, and a considerable portion of the laboring class—that most capable of endruing fatigue, most enured to exposure—has heretofore been regarded as unfit material for war. Even now that the initiative in its employment has been taken, it is regarded by many as of doubtful expediency. Would it be philosophical statesmanship, under the widely differing circumstances of our country, to model our system upon any one of those adduced? Are we to suppose that the framers. of our constitution contemplated any such conformity; and shall we, upon that hypothesis, derive from any, or all of these systems, a specific limit upon the power of Congress? On the contrary, the circumstances referred to, demand for that body greater latitude of discretion in the imposition of the burthens of war; and we repeat, the manner in which that department is constituted, makes it an eminently safe depository of the power. In the exercise of their discretion, they have incorporated into the army certain persons unfit for field service, and therefore not required to go to the field, as fighting men, but able to perform service in some of the necessary military departments, and therefore

assigned to duty in them. They are withdrawn from their usual pursuits, separated from the body of their fellow-citizens, placed under military rule, and employed in aid of military operations. How, then, can we say they are not in the army, but held to other servitude without warrant in the constitution?

It may be useful to glance at the history of the legislation which terminated in this enactment. Upon the first resort to compulsory enrollment, the Congress called into service white male residents within certain ages, but exempted wholly, such of them as were found incapable of active service in the field. Why this exemption? Because it was believed that the remainder of the class would furnish men enough for the service, both as combatants and non-combatants. The casualties of war, however, and its increasing proportions, demanded a first and second accession of numbers, and these were furnished by calling out other classes, also designated by age. But the demand for recruits was not filled. The Congress, surveying the various branches of the service, found employed as non-combatant but necessary instruments, very many able bodied men, who, if liberated from these employments, might be used to strengthen materially the forces in the field, and desiring to send them there, sought, in the population of the States, substitutes for them in their comparatively safe and easy berths. Here, then, was presented the alternative of going below the age of seventeen, or above that of fifty years, or both, or else of resorting to persons previously exempted. They determined upon a re-examination of the latter, between the ages of eighteen and forty-five, to ascertain who among them, though incapable of arduous service, might be able to do duty not requiring either the fullness of manly vigor, or the possession of all the physical senses, or the perfect use of every limb, or the largest share of health. Still, all are not to be taken, and those taken are not to be burthened (as will presently appear) beyond their capacity. They were previously wholly exempted, because it was supposed the public safety did not

require their service; they are now partially burthened, because that is required by the public interest. Their first was an absolute, their present is a qualified, but still a valuable, exemption. Both rest upon a tender regard for infirmity. The relators, however, claim that because they cannot perform every duty of military service, they must be exempt from all. We think this rests in the sound discretion of Congress, and are unable to discern, in the enactment, either usurpation or abuse of power. It would seem rather anomalous, that those who deny to the Congress discretion in the construction of armies, which they are expressly authorized to raise, should seek to devolve that function upon the judiciary. Yet, such is the effect of the argument.

It is supposed, and has been strenuously urged, that in the cases of *Barber vs. Irwin*, and *Jones vs. Mercer*, &c., &c., lately determined at Milledgeville, but as yet unpublished, we have virtually settled this question in favor of the relators. This is a mistake into which our brethren would not have fallen, had they heard or read the opinion in those cases. The question there, was the liability of the relators to service in the State militia, upon the call of the Governor. They claimed exemption upon the ground that they were in the service of the Confederate States, some as exempted, and others as detailed, agriculturists, under the tenth section of the act we have now before us. We regarded them all as exempts, and, of course, not in the army; and further, that although exempted conditionally, they were not in the civil employment of the Confederate States, as officers or agents for the execution of constitutional functions. For these reasons, we held them liable to the militia service of the State. There is one significant difference between the posisions of the relators in those cases and in these. The former highly prized their status, and were willing to give a consideration for it; whilst the latter have a decided repugnance to theirs, being unwilling to hold it for pay. The reason of this difference is, that the latter are, and the former are not, in the army.

[3.]·It only remains that we consider the second question, viz: whether the proceedings in the cases of these relators were in conformity with the law.

In Kaughman's case, the return shows only, that he was enrolled, and assigned to duty in a hospital, and by the surgeon in charge, employed in baking bread for it. Brady, it appears, was simply "found fit for light duty," and had been in camp four months without being assigned to any duty. The eighth section of the act, as has been seen, provides that certain enumerated duties shall be performed by "persons within the ages of eighteen and forty-five years, and who, by a report of a board of army surgeons, shall be reported as unable to perform active service in the field, but capable of performing some of the above-named duties, *specifying which.*" In the cases before us, there is no evidence of a report by a board of army surgeons, and if we are to infer anything as to its existence, our inference must be that it was fatally vague. It was not enough to say of Kaughman, that he was capable of "hospital duty," or of Brady, that he was fit for "light duty." Such is not the language of the statute. If surgeons be permitted to construe the act so as to embrace all "light duties," and if post, district, or department commanders, be then permitted to determine what are "light duties," it requires no gift of prophecy to foresee departures from the intention of the legislature. This course of proceeding ignores the concluding words of the section, which we have italicised. There must be, in each case, a report of a board of army surgeons, affirming the capability of the conscript to perform some one, or more, of the duties named, and it must specify which of them. A man might be capable of performing the duty of a clerk, but not that of a guard or of a laborer. The duty of determining with precision his capability, is devolved upon army surgeons, as experts, and is a valuable protection to the conscript. ·

It is matter of substance and not of form. We do not mean to say that the particular department, or still less, the

precise locality of his employment, shall be embraced in the Surgeon's report. These respect, not his capability of, but his assignment to, duty. But the kind of duty for which the person examined is fit, as whether for that of clerk, or guard, &c., &c., in any of the departments or situations named, must be specified in the report, and the assignment must conform to the specification. No other construction will give effect to the whole of the section.

In these cases the law has not been obeyed. For that reason, we affirm the judgment of the Court below; whilst we reverse it in so far as it rules the eighth section of the act entitled "An act to raise forces to serve during the war," approved Feb. 17th, 1864, unconstitutional.