### ANGELUS v. SULLIVAN et al.

(Circuit Court of Appeals, Second Circuit. October 22, 1917.)

No. 130.

1. ARMY AND NAVY ⬤⟞20—COMPULSORY SERVICE AND DRAFTS—STATUTORY PROVISIONS.

The Conscription Act of May 18, 1917, c. 15, is within the express power conferred on Congress by Const. art. 1, § 8, to raise and support armies, as the Constitution does not prescribe the mode in which the powers shall be exercised, but confers it fully, completely, and unconditionally, and it is for Congress to determine the means by which the armies shall be raised.

---

⬤⟞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

2. CONSTITUTIONAL LAW ⬡83(2)—PERSONAL RIGHTS—PROHIBITION OF INVOLUNTARY SERVITUDE.

The Conscription Act of May 18, 1917, does not violate Const. Amend. 13, providing that neither slavery nor involuntary servitude, except as punishment for crime, shall exist within the United States, as the purpose of that amendment is to abolish slavery and make peonage impossible, and men drafted into the military or naval service are not held in slavery nor involuntary servitude within that amendment.

3. CONSTITUTIONAL LAW ⬡62—DELEGATION OF LEGISLATIVE POWERS TO EXECUTIVE.

The Conscription Act of May 18, 1917, is not unconstitutional as delegating to the President the power to raise armies, as Congress has authorized the President to resort to conscription, and has determined the class of persons who shall be subject to it, and it is within the power of Congress to give the President a discretion in respect to specified matters, the distinction being whether the power to make a law has been delegated, or whether authority or discretion as to its execution, to be exercised under and in pursuance of the law, has merely been conferred.

4. CONSTITUTIONAL LAW ⬡318—DUE PROCESS OF LAW—PROCEEDINGS UNDER CONSCRIPTION ACT.

Conscription Act May 18, 1917, § 4, providing for the creation of local and district boards, with jurisdiction to hear and determine all questions of exemption, and providing that their decisions shall be final, except that the President may affirm, modify, or reverse any such decision in accordance with rules and regulations prescribed by him, does not deny due process of law to a person asserting a right of exemption as an alien who has not declared his intention to become a citizen, as due process of law does not in every case require a judicial trial.

5. ARMY AND NAVY ⬡20—COMPULSORY SERVICE AND DRAFT—REVIEW BY COURTS.

Under Conscription Act, § 2, excluding aliens who have not declared their intention to become citizens from the persons subject to draft, section 4 providing for the creation of boards to pass on questions of exemption and making their decisions final, and the presidential regulations promulgated June 30, 1917, where a person claiming a right of exemption as an alien, who has not declared his intention to become a citizen, was given a full hearing by the local and district boards, and such boards did not reject or refuse to consider any evidence that he was entitled to present, their decision against the claim of exemption was final and could not be interfered with by the courts.

6. ARMY AND NAVY ⬡20—COMPULSORY SERVICE AND DRAFTS—REVIEW BY COURTS.

A decision of the boards created under the Conscription Act on a question of exemption is final only where the board has proceeded in due form, and the party involved is given a fair opportunity to be heard and to present his evidence, and if an opportunity to be heard is denied, or if the proceedings of the boards are without or in excess of their jurisdiction, or so manifestly unfair as to prevent a fair investigation, or if there has been a manifest abuse of the discretion with which they are invested, the aggrieved party has a right to go into the courts for the protection of his rights.

7. CERTIORARI ⬡16—RIGHT TO REMEDY—DECLARATION THAT DECISION SHALL BE FINAL.

The law courts have a general superintending control by certiorari over all inferior tribunals acting in a judicial or quasi judicial character, and jurisdiction is not entirely taken away by a statute declaring that the judgment of the inferior tribunal shall be final.

⬡For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

8. HABEAS CORPUS ⬠16—NATURE OF RESTRAINT—MILITARY AUTHORITY.

An individual restrained of his liberty by a decision of an executive officer or board declared final by statute may nevertheless be entitled to a writ of habeas corpus upon a proper showing, and, where a board denies a full and fair hearing to an individual claiming an exemption from military service under the Conscription Act, he may, if restrained of his liberty, sue out a writ of habeas corpus and obtain his liberty.

9. INJUNCTION ⬠94—PERSONAL RIGHTS—ADEQUACY OF REMEDY AT LAW.

A person denied a full and fair hearing on his claim of exemption under the Conscription Act is not entitled to an injunction restraining the local board, and all persons claiming to act in their authority, direction, or control, from certifying his name to the military authorities for military service, and directing them to grant him the exemption claimed, as courts of equity do not enforce mere personal rights as distinguished from property rights, there being a full and adequate remedy at law for. the redress of wrongs to the person.

10. INJUNCTION ⬠7—EXISTENCE OF OTHER REMEDY—CERTIORARI.

Courts of equity do not interfere by injunction for the purpose of controlling the action of public officers constituting inferior quasi judicial tribunals on matters properly pertaining to their jurisdictions, and do not review and correct errors in the proceedings of such officers,. the proper remedy, if any, being at law by certiorari.

Appeal from the District Court of the United States for the Southern District of New York.

Suit by John Angelus against John Sullivan and others, as members of the Local Board for Division No. 155 of the City of New York, state of New York. From an order dismissing the bill of complaint, complainant appeals. Affirmed.

Charles Recht, of New York City, for appellant.

Francis G. Caffey, U. S. Atty., of New York City, for appellees.

Before WARD, ROGERS, and HOUGH, Circuit Judges.

ROGERS, Circuit Judge. This suit was instituted for the purpose of securing a review in the courts of the action taken by the local and district exemption boards created under an act of the Congress of the United States known as the Conscription Act, approved May 18, 1917.

The complainant alleges that he is a subject of Austria-Hungary, and that he arrived in the United States on November 10, 1913. He avers that neither he nor his father at any time made declaration of intention to become a citizen of the United States, and that he is therefore an alien who has not declared his intention to become a citizen. He charges that as such he is not subject to conscription under the provisions of the Conscription Act, which provides that aliens who have not declared their intention to become citizens are not subject to the draft provided for in the said act. He avers that he filed an affidavit in due form, claiming exemption from military service by reason of the fact of his being an alien who had made no declaration of his intention to become a citizen, and that the defendants, who constitute local board No. 155 of the city of New York, which division has jurisdiction over the district in which he resides, denied his application for exemption; and that upon appeal to the district board of the city of New York, which is the local board having jurisdiction of appeals

⬠For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

from local board No. 155, the finding of the local board was affirmed. He has accordingly been certified and ordered to report for military service. He asks an injunction enjoining the defendants, and all persons claiming to act in their authority, direction, or control, from certifying his name to the military authorities for military service, and that the defendants be directed to grant him the exemption from military service to which he is entitled under the act, and to strike his name from the list of persons certified to as subject to military service. An order was granted by a judge of the District Court directing the defendants to show cause why they should not be enjoined and restrained pendente lite. Upon the return of the order to show cause, a special appearance was filed for the defendants, and motion was made to dismiss the proceedings for lack of jurisdiction. The motion was granted. In granting the motion the District Judge said:

"I think Congress had no intention that the courts should interfere with this drafting proposition. It is a military measure in time of war, and it would be most subversive of military control and the proper disposition of this extremely difficult new problem if the courts should interfere in this situation. If Congress had intended that the courts should review the action of the local and district boards it would have so provided, and, unless an appellate court says to the contrary, I am of the opinion that a District Court of the United States should resolve any doubt in favor of the government; any other view might tend seriously to embarrass the work of raising an army, with its manifold difficulties and its tremendous detail. If those who believe they are entitled to exemption were able to apply to the courts, it would be a most disturbing situation and directly contrary to my understanding of the intent of Congress. Congress intended this to be an executive measure, to be carried out by the executive branch of the government, without interference of the courts."

The appeal is taken from this order, and the complainant claims not only that the Conscription Act is unconstitutional, but that the District Court has jurisdiction to grant the relief asked for in the complaint.

[1] This court has no doubt as to the constitutionality of the act of Congress. The Constitution, art. 1, § 8, expressly provides that the Congress shall have power to raise and support armies, and to provide and maintain a navy, and to make rules for the government and regulation of the land and naval forces. The purpose of the Conscription Act is to raise an army, and the right to raise it does not involve the exercise of an implied power, but of one expressly granted. How can the courts deny to Congress a right which the Constitution in plain and distinct terms confers upon it?

The Constitution, in conferring the power upon Congress, has not prescribed the mode in which the power shall be exercised. The power is conferred fully, completely, and unconditionally. It is for the Congress to determine the means by which the army shall be raised. It is left to its judgment whether it shall be raised by calling for volunteers, or whether it shall be raised by conscription. At the time the Constitution was adopted conscription was not an unknown mode of raising armies, but had been resorted to by governments throughout the world.

In May, 1777, the General Assembly of Virginia had passed a Conscription Act which had been drafted by Thomas Jefferson. Writ-

ings of Thomas Jefferson (Ford's Ed.) vol. 2, p. 123. And other of the colonies had resorted to like measures. The Constitution adopted by New York in 1777 declared, "It is the duty of every man who enjoys the protection of society to be prepared and willing to defend it." If it had been intended that Congress should not have the power to raise anything but a volunteer army, the grant of power would have been restricted and not made unconditional. Conscription was resorted to on both sides during the Civil War, and the validity of the draft laws was upheld by the courts in the North and in the South. McCall's Case, Fed. Cas. No. 8669 (1863); Lanahan v. Birge, 30 Conn. 438, 443 (1862); Kneedler v. Lane, 5 Phila. (Pa.) 485; Id., 45 Pa. St. 238 (1863); In re Griner, 16 Wis. 423 (1863); Matter of Spangler, 11 Mich. 298 (1863); Druecker v. Salomon, 21 Wis. 621, 94 Am. Dec. 571 (1867); Allen v. Colby, 47 N. H. 544 (1867); Ex parte Coupland, 26 Tex., 386 (1862); Jeffers v. Fair, 33 Ga. 347 (1862); Barber v. Irwin, 34 Ga. 28 (1864); Parker v. Kaughman, 34 Ga. 136 (1865); Ex parte Hill, 38 Ala. 429 (1863); Ex parte Bolling, 39 Ala. 609 (1865); Gatlin v. Walton, 60 N. C. 333 (1864); Burroughs v. Peyton, 16 Grat. (57 Va.) 470 (1864).

And Judge Cooley, in his Principles of Constitutional Law, p. 99, discussing the power of Congress over armies, declares that "all persons capable of performing military duty, irrespective of age or previous exemptions, may be compelled to do so under laws for the purpose." The argument made against the constitutionality of the draft act of 1863 has always been regarded as extremely weak. The argument was that liability to compulsory military service was due, before the adoption of the Constitution, to the states; that it had not been granted to the federal government by the Constitution; and that it must, therefore, still be enforced, if at all, by the states. "Whether a power can be implied," said Mr. Lincoln, "when it is not expressed, has often been the subject of controversy; but this is the first case in which the degree of effrontery has been ventured upon of denying a power which is plainly and distinctly written down in the Constitution." Washington, who presided over the deliberations of the Constitutional Convention, transmitted to Congress, in the second year of his administration, a bill which provided for compulsory military service, which was jointly drawn by himself and General Knox, who was Secretary of War at the time. See American State Papers, vol. 1, p. 5.

The validity of the draft act of 1863 never was passed on by the Supreme Court. Mr. Justice Field, however, although the question was not directly involved, said in Tarble's Case, 13 Wall. 397, 408 (20 L. Ed. 597) (1871), in speaking of the power of the government to raise and support armies:

"The execution of these powers falls within the line of its duties, and its control over the subject is plenary and exclusive. It can determine, without question from any state authority, how the armies shall be raised, whether by voluntary enlistment or forced draft, the age at which the soldier shall be received, and the period for which he shall be taken, the compensation he shall be allowed, and the service to which he shall be assigned. * * *"

So in Jacobson v. Massachusetts, 197 U. S. 11, 29, 25 Sup. Ct. 358, 362 (49 L. Ed. 643) (1905), in discussing the liberty secured by the

Constitution of the United States, Mr. Justice Harlan, speaking for the court, declared that it did not import an absolute right in each person to be at all times and in all circumstances wholly freed from restraint, and he added that—

"he may be compelled by force, if need be, against his will, and without regard to his personal wishes or his pecuniary interests, or even his religious or political convictions, to take his place in the ranks of the army of his country, and risk the chance of being shot down in its defense. It is not, therefore, true that the power of the public to guard itself against imminent danger depends * * * upon his willingness to submit to reasonable regulations established by the constituted authorities, under the sanction of the state, for the purpose of protecting the public collectively against such danger."

[2] The Thirteenth Amendment to the Constitution did not restrict the power granted to Congress in the first article to which allusion has already been made. The amendment provides that—

"neither slavery nor involuntary servitude, except as punishment for crime, whereof the parties shall have been duly convicted, shall exist within the United States or any place subject to their jurisdiction."

The clear purpose of this amendment was to abolish slavery and to make peonage impossible. In discussing in the Slaughter House Cases, 16 Wall. 36, 72 (21 L. Ed. 394) (1872), the Thirteenth and Fourteenth Amendments, Mr. Justice Miller said:

"But what we do say, and what we wish to be understood, is that, in any fair and just construction of any section or phrase of these amendments, it is necessary to look to the purpose which we have said was the pervading spirit of them all, the evil which they were designed to remedy, and the process of continued addition to the Constitution, until that purpose was supposed to be accomplished, as far as constitutional law can accomplish it."

The Supreme Court in a recent case—Butler v. Perry, 240 U. S. 328, 36 Sup. Ct. 258, 60 L. Ed. 672 (1915)—sustained the validity of a state law which required every able-bodied male person over the age of 21 years and under the age of 45 years, who had resided in a county within the state for 30 days or more, to work on the roads and bridges of the county for 6 days, of not less than 10 hours each, in each year when summoned to do so. The act provided also that a person might render the required services by a substitute, or in lieu thereof pay the road overseer a certain sum to be turned into the county treasury. It was claimed that the act violated the Thirteenth Amendment, as it imposed involuntary servitude. The court, speaking through Mr. Justice McReynolds, declared that the term involuntary servitude was intended to cover those forms of compulsory labor akin to African slavery, which in practical operation would tend to produce like undesirable results. "It introduced," he said, "no novel doctrine with respect to services always treated as exceptional, and certainly was not intended to interdict enforcement of those duties which individuals owe to the state, such as services in the army, militia, on the jury, etc. The great purpose in view was liberty under the protection of effective government, not the destruction of the latter by depriving it of essential powers."

It is not a fair and just construction of this amendment to hold

that it was intended to withdraw from Congress the power to pass a Conscription Act. It affords no basis for the claim that it restricts the otherwise unlimited power of the Congress to raise armies. Men drafted into the military or naval service of the United States are not held either in slavery or in a state of involuntary servitude within any construction which can properly be placed on the Thirteenth Amendment. The basis for this construction is, as will appear more fully in a subsequent part of this opinion, that the act leaves to the determination of a board the decision of the exemption from military service which the complainant claims makes the decision final without a right of appeal to the courts.

[3] But it is said that this particular act is unconstitutional because Congress has delegated to the President the power to raise armies. The objection is without merit. The Congress has authorized the President to resort to conscription, and has determined the class of persons who shall be subject to it. It is the duty of the President to see that the law is carried into execution, and it is within the power of Congress to give him a discretion in respect to certain specified matters. The cases are numerous in which the courts have sustained the grant of powers which involve in a large degree the exercise of discretion and judgment. And it has been the practice of Congress for years to pass laws which have invested the President with discretionary authority that cannot be considered a delegation of legislative power. See Field v. Clark, 143 U. S. 649, 681, 12 Sup. Ct. 495, 36 L. Ed. 294. The true distinction has been said to be between the delegation of power to make the law, which necessarily involves a discretion as to what it shall be, and conferring authority or discretion as to its execution, to be exercised under and in pursuance of the law. The first cannot be done. The latter may be. Cincinnati, Wilmington, etc., R. Co. v. Commissioners, 1 Ohio St. 88.

Assuming then that the Conscription Act is not unconstitutional, we come to inquire whether the District Court was in error when it dismissed the complainant's bill. The District Judge dismissed the bill because in his opinion the act of Congress left the decision of the question of exemption to the final decision of a special tribunal created for the purpose.

[4] The act, after authorizing the President to draft men into military service of the United States and exempting from such draft certain classes, gives him authority to create throughout the several states and territories and the District of Columbia local boards. It provides in section 4 that "such boards shall have power within their respective jurisdictions to hear and determine, subject to review as hereinafter provided, all questions of exemption under this act." It also confers authority on the President to create district boards in each federal judicial district, and then provides as follows:

"Such district boards shall review on appeal and affirm, modify, or reverse any decision of any local board having jurisdiction in the area in which any such district board has jurisdiction under the rules and regulations prescribed by the President. Such district boards shall have exclusive original jurisdiction within their respective areas to hear and determine all questions or claims for including or excluding or discharging persons or classes of per-

sons from the selective draft, under the provisions of this act, not included within the original jurisdiction of such local boards.

"The decisions of such boards shall be final except that, in accordance with such rules and regulations as the President may prescribe, he may affirm, modify or reverse any such decision."

But it is said that the act is unconstitutional, in that it deprives the complainant of his liberty without due process of law, contrary to the Fifth Amendment of the Constitution, which declares that no person shall be deprived of life or property without due process of law. The Supreme Court has, however, held that a judicial trial does not prevail in every case. Murray's Lessee v. Hoboken Land & Improvement Co., 18 How. 272, 280, 15 L. Ed. 372 (1855). And in U. S. v. Ju Toy, 198 U. S. 253, 263, 25 Sup. Ct. 644, 646 (49 L. Ed. 1040) (1905), the court, speaking through Mr. Justice Holmes respecting the Chinese Exclusion Act (Act Sept. 13, 1888, c. 1015, 25 Stat. 476 [Comp. St. 1916, §§ 4306, 4314]), under which the decision of the Department of Labor is final as to the exclusion, said: "If, for the purpose of argument, we assume that the Fifth Amendment applies to him, and that to deny entrance to a citizen is to deprive him of liberty, we nevertheless are of the opinion that with regard to him due process of law does not require a judicial trial." That the decision of the question whether a person of Chinese descent was born in the United States, and therefore entitled to enter the country, or whether he was born in China and under the Exclusion Act not entitled to enter, may be intrusted to an executive officer whose decision is final, and that it is due process of law is established law. We see no reason why the same doctrine is not equally applicable to the case in hand. And we therefore hold that the complainant is not deprived of due process of law by being compelled to submit to the final decision of the local and district boards the question whether he is a subject of Austria-Hungary and whether he has not declared his intention to become a citizen of the United States.

The President in the exercise of the authority conferred on him has prescribed the rules and regulations for the local and district boards, and they were announced by the Secretary of War on June 30, 1917. And section 41 of the rules and regulations so prescribed is as follows:

"In the case of a claim of appeal filed by or in respect of any person from the final decision of a local board within the jurisdiction of such district board, the district board shall, if the name of such person is on the list certified to such district board by a local board within its jurisdiction as a person called and not exempted or discharged, examine and consider the claim, affidavits, and record in respect of such person filed with such district board by the local board.

"The district board may receive additional evidence in support of or in opposition to any such claim, provided such additional evidence is filed in the form of affidavits within five days after the receipt by such district board of the notice of filing a claim of appeal by or in respect of such person. Within five days after the closing of proofs in any such case, the district board shall decide in favor of or against any such claim, and shall affirm, modify, or reverse the decision of the local board. The decision of the district board shall be final.

"The district board shall thereupon notify, on a form provided by the Provost Marshal General for that purpose, the person by whom or in respect of whom such claim of appeal was filed that the district board has affirmed,

modified, or reversed, as the case may be, the decision of the local board. If the decision of the local board is affirmed, such person shall stand as called for military service to be finally accepted as hereinafter provided."

It thus appears that the complainant seeks to have the District Court set aside a decision on his exemption claim which the act and the rules and regulations of the President declare to be final.

The complainant's right of exemption is based on the provisions of section 2 of the Conscription Act, which provides that "such draft as herein provided shall be based upon liability to military service of all male citizens, or male persons not alien enemies who have declared their intention to become citizens, between the ages of twenty-one and thirty years, both inclusive, and shall take place and be maintained under such regulations as the President may prescribe not inconsistent with the terms of this act"; and on section 18 of the rules and regulations prescribed by the President, which enumerates the persons or classes of persons to be exempted by a local board. Among others it exempts any person who is a subject of Germany, whether such person has or has not declared his intention to become a citizen of the United States. It then exempts "any person who is a resident alien; that is, a citizen or subject of any foreign state or nation other than Germany who shall not have declared his intention to become a citizen of the United States."

It also provides that "the claim to be exempted must be made by such person, or by some other person in respect of him, on a form prepared by the Provost Marshal General, and furnished by the local boards for that purpose." Such claims must be filed with the local board which notified such person that he is called for service on or before the seventh day after the mailing by the local board of the notice required to be given such person of his having been called for service. The statement on the registration card of any such person that exemption is claimed shall not be construed or considered as the presentation of a claim for exemption.

[5] If the complainant is, as he alleges, a subject of Austria-Hungary, and has never declared his intention to become a citizen of the United States, as he also alleges, it is perfectly clear that he is not subject to the draft. Whether his allegations in this respect are true must, however, be determined in the manner prescribed by the act.

It appears from the allegations of the complaint that the complainant filed an affidavit claiming exemption by reason of the fact that he was an alien, and that the local board denied his application, and that he appealed to the district board, which affirmed the local board. It thus appears that the complainant was heard, and it is nowhere alleged that he was denied a full hearing or that the board rejected or refused to consider any evidence that he was entitled to present. In the absence of such a showing, we have no doubt that the decision of the board is final and cannot be interfered with by the courts.

[6] We do not, however, agree with the statement of the District Judge heretofore quoted, that there can be no interference of the courts in the action of these boards. We think a decision of the boards is final only where the board has proceeded in due form, and where the party involved is given a fair opportunity to be heard and

to present his evidence. But if an opportunity to be heard should be denied, there can, be no doubt as to the right of the aggrieved party to come into the courts for the protection of his rights. And we do not believe that the District Judge meant to say that a decision must be regarded as final under such circumstances.

[7] The law courts have a general superintending control by certiorari over all inferior tribunals acting in a judicial or quasi judicial character. And jurisdiction is not entirely taken away by the words of a statute which declares that the judgment of the inferior tribunal shall be final.

In Rex v. Moreley, 2 Burr. 1014 (1760), the statute provided "that no other court whatsoever shall intermeddle with any cause of appeal upon this act; but they shall be finally determined in the quarter-sessions only." An application was made to the King's Bench, Lord Mansfield presiding, for a writ of certiorari to remove several orders made by a justice of the peace, and it was claimed that the writ could not issue because of the language of the statute. But the court was unanimously of the opinion that a certiorari ought to issue, and it was said that "a certiorari does not go to try the merits of the question, but to see whether the limited jurisdictions have exceeded their bounds." "The jurisdiction of this court," it was said, "is not taken away, unless there be express words to take it away; this is a point settled." Citing 11 Co. 64b; 4 Mod. 145; Salk. 45; 2 Hawk. P. C. 211. And see Lawton v. Commissioners, 2 Caines (N. Y.) 179 (1804); Rex v. The Justices, 3 D. & R. 35 (1823); State v. Falkinburge, 15 N. J. Law, 320, 322 (1836).

[8] And if an individual is restrained of his liberty by a decision of an executive officer or board declared final by statute, he may nevertheless be entitled to a writ of habeas corpus upon a proper showing. Thus in Chin Yow v. United States, 208 U. S. 8, 28 Sup. Ct. 201, 52 L. Ed. 369 (1908), the Supreme Court reversed the court below, and directed a writ of habeas corpus to issue upon an application made by a Chinese person who alleged that he was a citizen of the United States and detained unlawfully under a decision or order made by the commissioner of immigration at the port of San Francisco after a hearing, which decision had been affirmed by the Department of Commerce and Labor. But in that case the petitioner alleged that he had been prevented by the officials of the commissioner from obtaining testimony, and that if he had been given a proper opportunity he could have produced overwhelming evidence that he had been born in the United States and had departed to China on a temporary visit. The court in its opinion said:

"The decision of the department is final, but that is on the presupposition that the decision was after a hearing in good faith, however summary in form. As between the substantive right of citizens to enter and of persons alleging themselves to be citizens to have a chance to prove their allegation on the one side and the conclusiveness of the commissioner's fiat on the other, when one or the other must give way, the latter must yield."

And in directing the writ to issue Mr. Justice Holmes said:

"The courts must deal with the matter somehow, and there seems to be no way so convenient as a trial of the merits before the judge. If the petitioner

proves his citizenship, a longer restraint would be illegal. * * * But unless and until it is proved to the satisfaction of the judge that a hearing properly so called was·denied, the merits of the case are not open. and, we may add, the denial of a hearing cannot be established by proving that the decision was wrong."

There can be no doubt, therefore, that under the Conscription Act, where a board has denied a full and fair hearing to an individual claiming exemption from military service, he might, if restrained of his liberty, sue out a writ of habeas corpus and obtain his liberty.

[9] But whatever remedy the complainant may have or not have, there can be no doubt that he is not entitled to the relief he asks in his bill of complaint. It has heretofore been laid down by the textwriters and the courts as beyond the scope of the powers of a court of equity to enforce mere personal rights as distinguished from property rights. This, it need not be said, has not been due to the fact that equity regarded rights of property as more sacred than rights of the person. But the reason for it lies in the fact that equity affords no remedy where there is a full and adequate remedy at law, and that the ordinary process of the law courts are fully adequate for the redress of wrongs to the person.

In Bispham's Equity (8th Ed.) p. 58, the rule is laid down that:

"Equity is concerned only with questions which affect property, and it exercises no jurisdiction in matters of wrongs to the person as to political rights, or because the act complained of is merely criminal or illegal."

In Kerr on Injunctions Ed. pp. 1 and 2, it is said:

"A court of·equity is conversant only with questions of property and the maintenance of civil rights. Injury to property, whether actual or prospective, is the foundation on which its jurisdiction rests. A court of equity has no jurisdiction in matters merely criminal or merely immoral, which do not affect any right to property. If a charge be of a criminal nature, or an offense against the public peace, and does not touch the enjoyment of property, jurisdiction cannot be entertained."

In the later editions of this work this statement is omitted because of an act of Parliament which has authorized the courts of that country to grant injunctions in cases where formerly they did not possess the power.

In 16 Am. & Eng. Encyc. of Law, p. 363, the law is stated as follows:

"A court of equity has no criminal jurisdiction and cannot interfere to prevent the commission of criminal or illegal acts unless there is some interference, actual or threatened, with property or rights of a pecuniary nature; but when there is such interference, and there is no adequate remedy at law, the fact that the act may be criminal will not divest the jurisdiction of equity to prevent it."

And in the case of In re Sawyer, 124 U. S. 200, 210, 8 Sup. Ct. 482, 487 (31 L. Ed. 402) (1888), the Supreme Court, speaking through Mr. Justice Gray, said that "the office and jurisdiction of a court of equity, unless enlarged by express statute, are limited to the protection of rights of property." To assume jurisdiction in other classes of cases he says would be to "invade the domain of the courts of com-

mon law, or of the executive and administrative department of the government."

Mr. Justice Brewer in the case of In re Debs, 158 U. S. 564, 593, 15 Sup. Ct. 900, 910 (39 L. Ed. 1092) (1895), speaking for the court and discussing the power of a court of equity to issue an injunction, declared that:

"Something more than the threatened commission of an offense against the laws of the land is necessary to call into exercise the injunctive powers of the court. There must be some interferences, actual or threatened, with property or rights of a pecuniary nature; but when such interferences appear the jurisdiction of a court of equity arises, and is not destroyed by the fact that they are accompanied by or are themselves violations of the criminal law."

In Davis & Farnum Mfg. Co. v. Los Angeles, 189 U. S. 207, 217, 23 Sup. Ct. 498, 47 L. Ed. 778 (1903), Mr. Justice Brown, speaking for the court as to the jurisdiction of a court of equity, cites approvingly In re Sawyer, supra, saying that no further reference is deemed necessary.

In Truax v. Raich, 239 U. S. 33, 37, 33 Sup. Ct. 7, 60 L. Ed. 131, L. R. A. 1916D, 545, Ann. Cas. 1917B, 283 (1915), Mr. Justice Hughes refers to In re Sawyer, and declares that while a court of equity generally has no jurisdiction to restrain criminal prosecution under unconstitutional enactments, still it has such jurisdiction "when the prevention of such prosecutions is essential to the safeguarding of rights of property."

In Green v. Mills, 69 Fed. 852, 16 C. C. A. 516, 30 L. R. A. 90 (1895), a case in the Circuit Court of Appeals for the Fourth Circuit, Chief Justice Fuller, sitting as a Circuit Judge and writing the opinion, it was held that a court of equity had no jurisdiction of a bill seeking to enjoin a county supervisor of registration from performing the duties prescribed by the state registration laws, on the ground that such laws were unconstitutional and operated to deprive the plaintiff and others of their right to vote. In the course of his opinion the Chief Justice said:

"It is well settled that a court of chancery is conversant only with matters of property and the maintenance of civil rights. The court has no jurisdiction in matters of a political nature, nor to interfere with the duties of any department of government, unless under special circumstances, and when necessary to the protection of rights of property, nor in matters merely criminal, or merely immoral which do not affect any right of property."

In Corliss v. E. W. Walker Co. (C. C.) 57 Fed. 434, 31 L. R. A. 283 (1893), Circuit Judge Colt said:

"There is another objection which meets us at the threshold of this case. The subject-matter of the jurisdiction of a court of equity is civil property, and injury to property, whether actual or prospective, is the foundation on which its jurisdiction rests. * * * It follows from this principle that a court of equity has no power to restrain a libelous publication."

In Taylor v. Kercheval (C. C.) 82 Fed. 497 (1897), District Judge Baker said:

"It is firmly settled that courts of chancery concern themselves only with matters of property and the maintenance of civil rights; such courts have no

jurisdiction in matters of an executive or political nature; nor do they interfere with the duties of any department of the government except under special circumstances, and then only when necessary to the protection of rights of property; nor can they interfere to restrain criminal or immoral acts unless they affect or threaten to invade rights of property."

In Muhler v. Hedekin, 119 Ind. 481, 20 N. E. 700 (1889), the court, speaking of a court of chancery, declared that:

"The subject-matter of their jurisdiction relates to civil property, * * * actual or threatened, is the foundation of chancery jurisdiction. It is not concerned with matters of a political nature. * * * The general principle that equity possesses no power to revise, control, or correct the action of public, political, or executive officers or bodies, is, of course, well understood."

In Chappell v. Stewart, 82 Md. 323, 33 Atl. 542, 37 L. R. A. 783, 51 Am. St. Rep. 476 (1895), a bill alleged that defendant had employed detectives to watch the plaintiff and thereby caused annoyance and damage to him, and asked for an injunction to restrain the alleged conduct. The injunction was refused by the court below, and the Supreme Court affirmed, and said:

"Courts of equity exercise a very extensive jurisdiction in cases involving property rights. * * * In this case it is alleged that rights affecting the complainant's person have been violated, and that there is a purpose to persist in violating them. The ordinary processes of the law are fully competent to redress all injuries of this character. They have always been considered beyond the scope of the powers of a court of equity."

Numerous other cases have announced the same doctrine, a few of which are cited. Fletcher v. Tuttle, 151 Ill. 41, 53, 37 N. E. 683, 25 L. R. A. 143, 42 Am. St. Rep. 220 (1894); City of Chicago v. Chicago City Ry. Co., 222 Ill. 560, 570, 78 N. E. 890 (1906); Brown v. Birmingham, 140 Ala. 590, 596, 37 So. 173 (1903); Winnett v. Adams, 71 Neb. 817, 824, 99 N. W. 681 (1904); Roberson v. Rochester Folding Box Co., 171 N. Y. 538, 550, 64 N. E. 442, 59 L. R. A. 478, 89 Am. St. Rep. 828 (1902); Vanderbilt v. Mitchell, 72 N. J. Eq. 910, 67 Atl. 97, 14 L. R. A. (N. S.) 304; Northwestern Law Review, vol. 3, p. 1.

[10] And the rule is that courts of equity do not interfere by injunction for the purpose of controlling the action of public officers constituting inferior quasi judicial tribunals, on matters properly pertaining to their jurisdictions, and that they do not review and correct errors in the proceedings of such officers, the proper remedy, if any, being at law by writ of certiorari. See High on Injunctions (4th Ed.) vol. 2, § 1311.

In Moore v. Smedley, 6 Johns. Ch. (N. Y.) 28, Chancellor Kent said:

"I cannot find, by any statute, or precedent, or practice, that it belongs to the jurisdiction of chancery, as a court of equity, to review or control the determination of the supervisors, in their examination and allowance of accounts * * * and causing the money to be raised * * *; the review and correction of all errors, mistakes, and abuses in the exercise of the powers of subordinate public jurisdictions, and in the official acts of public officers, belongs to the Supreme Court. * * * It has always been a matter of legal, and never a matter of equitable, cognizance."

And see Mayor v. Merserole, 26 Wend. (N. Y.) 132, reversing s. c., 8 Paige, Ch. (N. Y.) 198; Van Doran v. Mayor, 9 Paige, Ch. (N. Y.)

388; Hyatt v. Bates, 40 N. Y. 164; McBride v. Newlin, 129 Cal. 36, 61 Pac. 577.

Counsel for complainant pressed upon our attention at the argument the case of Wise v. Withers, 3 Cranch, 331, 2 L. Ed. 457, decided by the Supreme Court in 1806. In that case the plaintiff claimed exemption from military service on the ground that as a justice of the peace he was not liable to serve in the militia. It appears that a militia fine had been imposed on him, and the defendant had entered his house and taken away his goods. The action was in trespass vi et armis. The court held that a justice of the peace within the District of Columbia was exempt from the performance of military duty, and, speaking through Chief Justice Marshall, said:

"It follows, [therefore] from this opinion that a court-martial has no jurisdiction over a justice of the peace as a militiaman; he could never be legally enrolled; and it is a principle that the decision of such a tribunal, in a case clearly without the jurisdiction, cannot protect the officer who executes it. The court and the officer are all trespassers. The judgment is reversed."

And counsel in his brief informs us that "there is practically no difference in principle between the Wise Case and the one at the bar on the main point, namely, that the person attempted to be drafted is not subject to the draft act, and therefore nothing which is done with respect to him is lawful." But conceding that what was done in the Wise Case was unlawful, counsel certainly would not have us believe that the justice of the peace could have righted his wrong in a court of equity.

While disagreeing, therefore, with the opinion expressed by the District Judge, that the courts cannot interfere with the action of the boards and holding, as we do, that the civil courts can afford relief from orders made by such boards in any case where it is shown that their proceedings have been without or in excess of their jurisdiction, or have been so manifestly unfair as to prevent a fair investigation, or that there has been a manifest abuse of the discretion with which they are invested under the act, we nevertheless approve the conclusion he reached that the bill should be dismissed. .

Order affirmed.

WARD, Circuit Judge. I concur in the opinion of the court without expressing any opinion as to the precise jurisdiction of courts of equity over purely personal rights, or any opinion as to whether an unlawful compulsion of a man's labor or services does not concern property as well as personal rights.